AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | |
|---|---|
| United States of America<br>v.<br>Juan Carlos Cordova Martinez (YOB 1999)<br><br>*Defendant(s)* | )<br>)<br>)   Case No.  MJ 25-524 JMR<br>)<br>)<br>)<br>) |

**FILED**
United States District Court
Albuquerque, New Mexico
Mitchell R. Elfers
Clerk of Court

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __03/06/2025 - 03/18/2025__ in the county of __Bernalillo__ in the _____ District of __New Mexico__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 USC § 1324(a)(1)(A)(iii) | Harboring an Illegal Alien |

This criminal complaint is based on these facts:

Please see the attached affidavit of FBI Special Agent Christine Zachry, which is incorporated by reference and has been reviewed by AUSA Timothy Trembley

☑ Continued on the attached sheet.

*Complainant's signature*

Christine Zachry, FBI Special Agent
*Printed name and title*

Telephonically sworn and electronically signed.

Date: 3/24/2025

*Judge's signature*

City and state: Albuquerque, New Mexico                Jennifer M. Rozzoni, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, Christine Zachry, Special Agent with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since August 2023. As such, I am a federal law enforcement officer within the meaning of Rule 41 of the Federal Rules of Criminal Procedure. I am currently assigned to the FBI's Transnational Organized Crime Task Force, at the Albuquerque Field Office of the FBI. I primarily investigate Transnational Organized Crime enterprises and Drug Trafficking Organizations ("DTOs") involved in the unlawful possession of firearms, distribution of controlled substances, and other crimes and conspiracies associated with these offenses. Because this affidavit is submitted for the limited purpose of securing a complaint and arrest warrant, I have not included every fact known to me concerning this investigation. I have set forth only those facts I believe are necessary to establish probable cause to support a criminal complaint against Juan Carlos Cordova Martinez (MARTINEZ).

2. This affidavit is based on my observations and information obtained from other law enforcement sources, including oral and written reports. It does not set forth all of my knowledge related to this investigation. Many of the witness statements described below have been translated from Spanish to English and summarized for purposes of this affidavit; they are not intended to be verbatim transcriptions of what was said.

3. This affidavit is submitted in support of a criminal complaint charging Juan Carlos Cordova Martinez (MARTINEZ) with the following violations:

8 USC § 1324(a)(1)(A)(iii), that being Harboring an Illegal Alien.

**PROBABLE CAUSE**

**I. Victim J.A. Reporting**

4. In March of 2025, MARTINEZ and others known and unknown to law enforcement, assisted J.A.[1] in illegally immigrating to the United States in exchange for approximately 9,500 United States Dollars (USD), which was paid in advance of his arrival to Albuquerque, New Mexico (NM). J.A. intended to finish his journey in Reno, Nevada.

5. J.A. was originally told that it would cost 1,000 USD to be smuggled across the border. J.A. was smuggled across the border on March 4, 2025, through El Paso, Texas. The smugglers recorded a video of him saying his name, the date, and that he was doing okay. J.A. also thanked the smugglers for bringing him to the United States in the video. Once J.A. completed the

---

[1] Based on my participation in this investigation, including my review of reports and in talking to other officers, I know the identity of J.A. To protect his identity and privacy; however, I have anonymized his identity in this Affidavit.

video, J.A. got into a vehicle in El Paso. While in the vehicle, the smugglers took his phone and did not allow him to contact family or friends. The smugglers recorded another video of J.A. saying the same information.

6. Based on my training and experience, I know human smugglers take videos of the smuggled victims to send to the smuggled person's family as a proof-of-life. Human smuggling proof-of-life videos frequently include the smuggled victim's name, the date, and their condition. These videos are sent to the family members of smuggled victims to indicate the amount of money owed or as a tool to extort the families for additional money. Specifically, the videos that the smugglers took of J.A. appear to be proof-of-life videos based on the content of the videos.

7. Once J.A. reached Hatch, NM, the smugglers reached out to J.A.'s brother and told him that he had to pay an additional 8,500 USD for taking J.A. from El Paso, TX to Hatch, NM.

8. J.A. changed vehicles and was driven to Albuquerque, NM. Once in Albuquerque, J.A. was transferred into a different vehicle, a silver Tahoe, driven by two males, mid-twenties, average height, and bulky builds. He stated that one of the individuals appeared to be the boss and went by "Luis." The second male went by "Poncho." J.A. also described a bigger male with half red and half black hair. The male with half red and half black hair drove him in the Tahoe to the Albuquerque "stash house," arriving on March 6, 2025. [2]

9. Through Google Earth photos, J.A. identified 529 Utah Street, NE, Albuquerque, NM (SUBJECT RESIDENCE), as the stash house. Upon arrival to the SUBJECT RESIDENCE, the smugglers took J.A. into the middle apartment. The smuggler then took him out the back of the middle apartment, into the back alley, and then into the apartment immediately west of the middle one.

10. Through physical surveillance and previous investigations, Law Enforcement Officers (LEOs) identified the middle apartment as unit "B" and the apartment farthest west as unit "C."

11. J.A. also identified multiple vehicles, depicted in Google Earth images, as the vehicles used by the smugglers. Specifically, J.A. identified the silver Chevrolet Tahoe (SUBJECT VEHICLE) in Google Earth images as the vehicle that transported him to the SUBJECT RESIDENCE.

12. LEOs, through physical surveillance, identified the SUBJECT VEHICLE bearing license plate VYD8466.

13. Upon arrival at the SUBJECT RESIDENCE Unit C, J.A. identified about 20 other males in the apartment. J.A. attempted to open the doors of the apartment while in Unit C, but the doors were locked from the outside, preventing him from leaving. J.A. described the doors as having locks on the outside only, which allowed the smugglers to lock him inside. *Refer to Image*

---

[2] A "stash house" is a location, usually known to only a few trusted criminal organization members where the criminal organization will store contraband, to include drugs, firearms, and/or money, and/or smuggled victims.

*A and Image B.* On several occasions, J.A. was moved into Unit B for a short time and witnessed four females who were also being smuggled.

14. At one point, J.A. asked the smugglers why they were not taking him to Reno, Nevada like he requested, and the smugglers ignored him and continued to keep him in the locked room.

15. The smugglers fed the smuggled victims once a day. On one occasion, J.A. banged on the doors and walls to request more food. The individual, known to J.A. as Luis, came over with a handgun and demanded to know who was making the noise and knocking. Louis pointed the firearm at everyone while asking who was making all the noise and was yelling at everyone in the room. One smuggled person said that they were hungry; however, Luis told them to be quiet and that they would take them from the apartment soon. J.A. was afraid that he or any of the other smuggled victims could have been shot by Luis.

16. Following the incident, the smugglers moved 18 people from both unit B and C out of the SUBJECT RESIDENCE. After a few days, more smuggled victims arrived and left shortly thereafter. J.A. still could not leave the SUBJECT RESIDENCE. J.A. described an almost constant rotation of smuggled victims arriving and departing the SUBJECT RESIDENCE.

17. Based on my training and experience, human smuggling organizations (HSOs) maintain stash houses like checkpoints. Drivers bring smuggled persons to a house where the smuggled victims wait to be driven to their destination or to the next checkpoint on their way to their destination. Once smuggled victims depart the stash house, the HSO coordinates the arrival of more smuggled victims into the stash house. Based on the constant rotation of smuggled victims in and out, the SUBJECT RESIDENCE was likely a stash house for the HSO.

18. J.A. reported not having access to his cellular telephone, while at the SUBJECT RESIDENCE. J.A. was only allowed supervised phone calls with the limited purpose of asking for money from his brother.

19. J.A. reported that he begged the smugglers to allow him to call his brother to request the 1,300 USD to be released or taken to his destination in Reno, Nevada. The smugglers permitted him to call his brother on March 16, 2025, but his brother informed J.A. that he had already paid additional demanded money. J.A. told the smugglers that his brother had paid, but the smugglers ignored J.A., and Poncho told J.A. that they did not know what he was talking about.

20. On March 17, 2025, Poncho told J.A. that the smugglers were going to turn him into immigration or figure out "what to do with him." Based on the conversation, J.A. became concerned for his safety and determined that he would escape.

21. Later the same day, J.A. escaped from the SUBJECT RESIDENCE by removing a screw from a barred window in Unit C, crawling through the window, and running away from the SUBJECT RESIDENCE. J.A. borrowed a phone and was able to find a family friend to pick him up.

22.     On March 18, 2025, J.A. contacted Immigration Law Center (ILC) in Albuquerque, New Mexico (NM) to report the hostage situation. An employee of ILC contacted Albuquerque Police Department (APD) Detective Kellie Whitehouse (Whitehouse) regarding J.A.

## II.     Search of Stash House

23.     On March 18, 2025, pursuant to State of New Mexico warrant, APD executed a search of the SUBJECT RESIDENCE Units B and C and the SUBJECT VEHICLE.

24.     As APD drove up to the SUBJECT RESIDENCE, the male with half red and half black hair, departed the SUBJECT RESIDENCE in the SUBJECT VEHICLE.

25.     While APD Special Weapons and Tactics (SWAT) executed the search of the SUBJECT RESIDENCE Units B and C, APD field officers conducted a traffic stop of the SUBJECT VEHICLE. Field officers detained the driver, a male with half red and half black hair. The male was identified as Juan Carlos Cordova Martinez (MARTINEZ).

26.     A subsequent immigration records search revealed no current or pending immigration status for MARTINEZ allowing him to legally enter or reside in the United States.

## III.    Confirmation of the Identity of MARTINEZ

27.     J.A. confirmed that he recognized MARTINEZ based on a photo. J.A. stated that MARTINEZ was one of the smugglers who watched him. J.A. identified MARTINEZ as "one of the bad guys." J.A. reported that MARTINEZ watched over everyone held at the SUBJECT RESIDENCE from the outside, looking through the windows. While J.A. was there, MARTINEZ was at the SUBJECT RESIDENCE approximately every day. If anyone ever attempted to look out of a window, MARTINEZ got mad at them and yelled at them to stop.

28.     While Luis and Poncho maintained the keys to the SUBJECT RESIDENCE, J.A. stated that MARTINEZ always had a phone with him and frequently made calls.

29.     Based on my training and experience, human smuggling operations typically maintain stash houses that are monitored by a member of the human smuggling group. This individual stays at the house at nearly all times to ensure no smuggled victims leave or make their presence known to people outside the stash house. Additionally, the individual monitoring the house maintains ongoing communication with the leaders of the organization through frequent cellular telephone contact. Specifically, MARTINEZ stayed at the SUBJECT RESIDENCE, monitoring the smuggled victims and ensuring they stayed inside and out-of-sight.

30.     During an interview with MARTINEZ on March 18, 2025, MARTINEZ told LEOs that he lived at the SUBJECT RESIDENCE in unit C.

## IV.    Stash House Findings

4

31. APD SWAT recovered seven people between the B and C units at the SUBJECT RESIDENCE.
32. During the search of the SUBJECT RESIDENCE, APD identified doors to Unit C and B as having locks on the exterior of the door. Additionally, every window of the SUBJECT RESIDENCE unit B and C had bars on the windows. *Refer to Images A, B, and C.*



*Image A: The image is of the exterior of the backdoor to Unit C.*



*Image B: The picture is taken from inside the SUBJECT RESIDENCE looking outside and shows the deadbolts facing the exterior of the apartment.*



*Image C: The picture is taken from the exterior of the back of unit B facing unit C. The image shows the bars on the exterior of both windows.*

33. Based on my training and experience, human smugglers maintain padlocks or deadbolts on the exterior of stash houses to prevent smuggled victims from exiting the building and alerting authorities of their presence. The doors of the SUBJECT RESIDENCE appeared to be intentionally manufactured to prevent the smuggled victims of units B and C from leaving as the deadbolts in both *Image A and B* face the exterior of the house. Additionally, the SUBJECT RESIDENCE had bars on all exterior windows to prevent escape through the windows. *Refer to Image C.*

34. Additionally, APD identified a cellular telephone, identified as belonging to J.A. in bedroom 1 of unit B. Investigators found the phone in a drawer of a plastic container. J.A. reported that he was not allowed to go into unit B, aside from his first night walking through unit B to get to unit C and infrequent occasions he described.

7

35. Based on my training and experience, human smuggling organizations (HSO) frequently separate smuggled victims from their phones to prevent them from notifying families or authorities of their location or their living conditions. As J.A. did not have the ability to go into unit B, I know the HSO members intentionally prevented J.A. from accessing his phone.

36. Based on my training and experience and the investigation described herein, I have reason to believe MARTINEZ was a member of an alien smuggling organization, operating as a manager of a stash house.

## VIII. Conclusion

37. Based on the facts above, there is probable cause to believe that between on or about March 6 and March 18, 2025, in Bernalillo County in the District of New Mexico, MARTINEZ violated 8 USC § 1324(a)(1)(A)(iii), that being Harboring an Illegal Alien.

38. I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Respectfully submitted,

_____
**Christine Zachry**
Special Agent
Federal Bureau of Investigation

Telephonically sworn and electronically signed on March 24, 2025.

_____
Jennifer M. Rozzoni, United States Magistrate Judge